**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION**

| | | |
|---|---|---|
| KEIRAND R. MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15-cv-1058 |
| | ) | |
| STATE FARM MUTUAL | ) | |
| AUTOMOBILE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on Plaintiff Keirand R. Moore's Motion for Summary Judgment (d/e 94) (Motion 94) and Jury Request (d/e 105); and Defendant State Farm Mutual Automobile Insurance Company's (State Farm) Cross-Motion for Summary Judgment on Events Leading up to and Culminating with Moore's 2012 Demotion and Corresponding Salary Reduction (d/e 110) (Motion 110), Cross-Motion for Summary Judgment on all Remaining Claims (d/e 114) (Motion 114), and Motion to Strike Reply (d/e 128) (Motion 128). The parties consented to proceed before a Magistrate Judge. <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered July 18, 2016 (d/e 39)</u>. For the reasons stated below, Motion 94 is DENIED, Motion 110 and

Motion 114 are ALLOWED, and Moore's Jury Request and Motion 128 are DENIED as moot.

STATEMENT OF FACTS[1]

Moore identifies himself as a black man.[2]  He began working for State Farm in 2001 as a Tech Support Specialist.  From 2002 to 2010, Moore received several promotions.  He became a Systems Support Specialist (SSS) in 2002, a Technical Analyst (TA) in 2005, a Test Analyst in 2007, and Business Analyst (BA) in 2010.  State Farm Response to Moore's Motion for Summary Judgment (d/e 108) (Response 108), Exhibit A, Deposition of Keirand Moore (Moore Deposition), vol. 1, at 221, and Moore Deposition Exhibits (d/e 109) (Moore Deposition Exhibit), Exhibit 67, State Farm Work History.[3]

In 2010, Moore was a Business Analyst working as a Customer Connection/Department Services (CCDS) consultant.  Doug Seidner supervised Moore.  Moore states that in April 2011, Seidner falsely stated

---

[1] State Farm rivals the federal government in the use of acronyms.  The Court has compiled a glossary of the meanings of terms that the Court gleaned from the documents.  The glossary is attached as an appendix to this Opinion.  The Court generally avoids using acronyms in this Opinion except in quotations.

[2] State Farm Response to Moore's Motion for Summary Judgment (d/e 108) (Response 108), Exhibit A, Deposition of Keirand Moore (Moore Deposition), Vol. 1 at 53 ("I am a black man, but I can't speak for how the rest of the race identifies themselves.").  The Court will use his preferred terminology of black rather than African-American.

[3] Volumes 1 and 3 of Moore's deposition are attached together as Exhibit A to Response 108.  Volume 1 contains pages 1-145 of the deposition.  Volume 2 contains pages 146-251 of the deposition, along with Moore's statements of corrections or changes.

that  Moore made remarks at a meeting that offended two individuals named Michelle Monk and John Diekhoff, described as "host/business partners."  Moore contacted these individuals.  Monk and Diekhoff told Moore that they were not offended and did not interpret Moore's comments as improper.  See Motion 94, at 5 of 31- 6 of 31; Emails attached as Exhibit 94-3; Response to Cross-Motion II 9-25-18 (d/e 123) (Response 123), at 6-7, 21.[4]  Moore told Seidner he contacted Monk and Diekhoff.  Moore states that, "Seidner was livid and chastised me for contacting them.  He was upset that I had followed up because he had been lying." (hereinafter referred to as the Lie).  Motion 94, at 5 of 31.  According to Moore, Seidner thereafter was out to get him for catching him in the Lie.

In approximately July 2011, Moore's three-person team in the Customer Connection/Department Services unit was dissolved.  The other two consultants were white.  Moore claims that the other two consultants were allowed to select their new assignments.  Moore states that Seidner required Moore to join the Client Production Team (CPT).  The Client Production Team performed technical work on mainframe computers.  Moore states that the work required proficiency in mainframe computer

---

[4] The Court uses the CM/ECF numbering to cite to pages in Motion 94 and to identify location of documents attached to Motion 94.  Moore did not number the pages of Motion 94 and did not assign numbers or letters to designate each exhibit.

languages such as RHUMBA, COBOL, and FORTRAN. Moore was not trained to use mainframe computers or these computer languages. Moore states that Seidner forced Moore onto the Client Production Team in retaliation for catching Seidner in the Lie. See Motion 94, at 3-5 of 31; Reply 116, at 38-39; Response 123, at 6-7, 21.

Seidner was supposed to supervise Moore on the Client Production Team, but an individual named Marsha Davis became Moore's supervisor instead. Motion 94, at 6 of 31. Moore was unable to perform his new job on the Client Production Team. See Moore's Reply in Support of Motion 94 (d/e 116) (Reply 116), at 19-20. On October 11, 2011, Davis gave Moore a written Performance Expectation document that outlined what Davis expected from Moore. Motion 94, First Set of Additional Exhibits (d/e 95) (Exhibits 95), at Exhibit 95-4 page 1 of 1, Performance Expectations for Keirand Moore. Moore was not able to meet these expectations. See Motion 94, at 12 of 31 – 16 of 31. Moore claims Seidner, with Davis' help, made sure Moore would fail as retribution for catching Seidner in the Lie. See Motion 94, at 5 of 31 – 6 of 31.

In 2011, Moore began experiencing medical problems. He was ultimately diagnosed with Crohn's disease. Stress exacerbated his symptoms. See e.g., Exhibits 95, Exhibit 95-8, Letters from Moore's

healthcare providers.  Moore's condition required him to miss work because of illness, medical appointments, and some hospitalizations.  See generally Motion 94, Exhibits 94-14 through 94-16, Collected Medical Records from 2011; Motion 94, Second Set of Additional Exhibits (d/e 96) (Exhibits 96), Exhibit 96-1, Collected Medical Records from 2011.

On February 20, 2012, Davis met with Moore.  Omar West from the Human Resources Department also attended the meeting.  Davis memorialized the events during the meeting in a memorandum dated March 5, 2012.  Moore Deposition Exhibits (d/e 109), Exhibit 17, Memorandum from Davis to Moore dated March 5, 2012 (March 2012 Memorandum).  During the meeting, Davis notified Moore that an audit showed he sent 102 copies of internal State Farm emails to his personal email account.  Moore's practice of sending copies of company emails to his personal email violated company policy.  Davis stated that the emails contained customer information and other information deemed confidential by State Farm.  Davis and Moore signed the March 2012 Memorandum.

On April 23, 2012, Moore spoke with an individual named Nancy Brooks at State Farm Human Relations.  He wanted an investigation of his 2009-2010 annual review.  State Farm's annual review process assigned employees a score of Level 1, Level 2, or Level 3 in the two areas:

"Results" and "Competencies."  The annual review covered a 12-month

period called a "Performance Cycle."  A Level 3 rating meant the person

"consistently exceeded expectations."  A level 2 rating meant the person

"consistently met and occasionally exceeded expectations."  A level 1

rating meant the person "achieved some expectations but missed others."

According to Moore, a rating of Level 3 was extremely rare, and rating of

Level 1 was considered a failure.  See Moore Deposition, vol. 2, at 230-31;

Motion 94, at 7 of 31- 8 of 31.  Moore received ratings of Level 1 in both

Results and Competencies in the 2009/2010 Performance Cycle.  Moore

Deposition Exhibits, Exhibit 910, Employee Performance Results Tool for

Moore for 2009/2010, at 8.  Moore had received ratings of Level 3 in

Results and Level 2 in Competencies during the 2008/2009 Performance

Cycle.  Moore Deposition Exhibits, Exhibit 9, Employee Performance

Results Tool for Moore for 2008/2009, at 10. Moore provided Brooks with

documents and asked for a review.  See Moore Deposition Exhibits, Exhibit

19, Email from Moore to West dated May 1, 2012 at 11:56 a.m.  Neither

Seidner nor Davis supervised Moore during the 2008/2009 or 2009/2010

Performance Cycles.

On May 1, 2012, Moore sent a letter to the State Farm Human

Resources Department to the attention of Nancy Brooks memorializing his

request for an investigation.  <u>Moore Deposition Exhibits</u>, Exhibit 18, <u>May 1,</u>

<u>2012 Letter</u>.  The letter stated:

> Good morning Nancy,
>
> The purpose of this correspondence is to document a formal request by Business Analyst Keirand R. Moore to State Farm Human Resources Department (Systems) to launch a formal investigation into the events that took place during the 2009/2010 performance cycle.
>
> During that performance cycle, I was a Test Analyst – Business (henceforth to be referred to as TAB) in Systems Technology. This investigation should reveal:
>
> - An explanation for why I received very positive documented feedback regarding my performance as a TAB from the Project Managers that I work for during that performance cycle, but still received the lowest possible performance rantings available.
> - An explanation for why I received very positive feedback regarding my performances as a TAB from the Test Manager, (Marla McElroy), whom I report to during that cycle in the form of a hand written "Thank You" care *after* the EPR was close rather than in the pages of the open EPR where such feedback belongs.
> - An explanation as to why the Test Managers (Rich Kasper and Marla McElroy) ignored all the evidences of the remarkable results and competencies that I had achieved, as well other documentation that I presented to them proving that I had done a much better than average job, with no documented issues of problems with competences or results from Project Managers and /or team mates.
> - Why the Test Managers did not find work for me after the performance cycle (this should be documented in Human Resources files)?  If I *had* been an under achiever, (which I obviously wasn't), with no work provided for me, there would be no chance for me to redeem myself and improve my performance.

- Why was I not given the equal opportunity to reap the benefits of back to back performance cycles where I gave documented remarkable service as a successful, professional testing lead?  (at the end of the performance cycle prior to that one, I received a 3/2 performance rating).
- What Project Manager would document in that cycle's feedback that I should "share my knowledge with others" if my performance during that cycle was a low as a "level 1"?  Surely she wouldn't be suggesting that we should have more "level 1" performers following my lead.

These issues are merely the beginning.  Please contact me as soon as the investigation begins.  I have so much more to add, including the devastating fallout from this that has affected me in a number of negative ways including the damage to my career ever since.

Thanks so much,

Keirand R. Moore

May 1, 2012 Letter.  Moore stated that he received the lowest possible performance rating during the 2009-2010 annual review.  Moore wanted an investigation because he believed he performed exceptionally well.

Omar West wrote an email to Moore in response to the May 1, 2012 Letter.  West wrote, in part:

Keirand, I am in receipt of your memo dated May 1, 2012 which was left with the assistant at the front desk in Human Resources.  The memo requests a formal investigation regarding events that took place during the 2009/2010 performance cycle.  It should be noted that leadership has had several conversations with you regarding your work performance in 2009/2010 to present, in addition to conversations regarding the fact that you are currently not

meeting your job expectations.  I will review your memo for new information regarding these matters and proceed appropriately.

Moore Exhibits, Exhibit 19, Email from West to Moore dated May 1, 2012,

at 11:05 a.m.  Moore replied to West's email.  Moore reiterated his

complaint about his 2009/2010 evaluation.  Moore stated:

> Mister West,
>
> In spite of the number of conversations that may have taken place regarding that performance cycle, I have yet to receive a satisfactory answer for why the feedback that I received from the PM's whose projects that I worked on during the cycle provided evidence that I was an above average performer, but the ratings that I received from the people that I reported to were unfavorable.  There is an obvious contradiction. "Leadership" did not provide any negative documentation regarding my performance, but I have provided plenty to support the really good work that I did.  The Test Manager that I reported to at the end of the cycle wrote positive things about my contributions to the team.  I want to provide that evidence to someone who will scrutinize it with no pre-conceived notions about me, review it fairly and see what happens.
>
> You said to communicate with you or my "HR rep".  Please tell me who my HR Rep is.  I prefer to work with that person.  I am willing to talk to the appropriate HR manager or executive as well.  I welcome that opportunity.  The feedback document form 2010 also includes favorable comments from Public Affairs regarding my leadership and contributions regarding volunteer work that I did during the same cycle.  So I was giving excellent service across departments.  But it's being ignored.  Can't let that happen.
>
> I left the memo for Nancy because I spoke to her on April 23rd and left several copies of documentation for HR to review.  I hadn't heard anything from HR since.  Based on your comments below [in the May 1 11:05 am email quoted above], I

would have to assume that you haven't seen them, or perhaps you have.  What happened in that cycle had led to the predicament that I am in now and I intend to prove that.  But I am requesting to work with some from HR who I hope has a fresh set of eyes and who will be impartial.  I am confident that if I can work with such a person, I will be vindicated.  But if the HR Rep already has his mind made up, I won't receive a fair and impartial chance to present my evidence.  Can't let that happen.

Again, I reiterate, I am requesting to speak to any HR Rep, HR Manager or HR executive or all of the above who is willing to hear me out.  All I ask is that they come into this situation with an open mind.

Keirand

Moore Deposition Exhibits, Exhibit 19, Email from Moore to West dated May 1, 2012 at 11:56 a.m.  The record before the Court does not indicate whether West responded.  Moore did not mention race discrimination in either the May 1, 2012 letter to  Brooks or the May 1, 2012 email to West.

In June 2012, Davis told Moore his duties were being transferred to a different unit in State Farm.  She offered him two options:  undergo retraining for a new assignment as a Business Analyst; or voluntarily accept a job change which would involve a transfer and demotion.  Moore's annual salary was then $55,365.  If he opted for retraining and he failed to meet her expectations in the new assignment, he could be subject to termination.  Moore Deposition Exhibits, Exhibit 20, Email from Marsha Davis to Keirand Moore dated June 8, 2012 at 7:23 a.m.  Moore believed

he would be fired if he opted to retrain for a different position in the Client Production Team.  See Moore Deposition, at 237-38.

On June 14, 2012, Moore wrote a memorandum accepting the option of the transfer and demotion.  Moore reiterated that he lacked the qualifications to work on the Client Production Team.  He stated, "It is due to that sad fact that I have no other viable alternative than to request a job change."  Moore Deposition Exhibits, Memorandum to Whom it May Concern dated June 14, 2012.

In July 2012, Moore was demoted from a Business Analyst to a Systems Support Specialist.  His annual salary was reduced from $55,365 to $51,294.  Moore was transferred to the Windows Server Hardware team (Server Hardware) within the Systems Technology unit of State Farm. Moore Deposition Exhibits, Exhibit 22, Memorandum from Marsha Davis to Keirand Moore dated July 20, 2012.

Moore states that when he arrived at his new position, he discovered a gap in the services provided by the Server Hardware team.  He stated that no one was performing the duties of a Service Level Liaison.  The parties do not fully explain the duties of a Service Level Liaison.  The evidence indicates that the Service Level Liaison interacted with different departments or units of State Farm that used the services of the Server

Hardware team.  The Service Level Liaison work included establishing agreements called Operational Level Agreements (OLAs) between Server Hardware and the other units of State Farm that used its services. According to Moore, the Service Level Liaison duties for Server Hardware were assigned to Mike Willis, a Business Analyst on the Server Hardware team.  Moore states that Willis was overwhelmed with other duties and was not performing Service Level Liaison functions.  See Reply 116, at 22-23; Response 123, at 32-33; Motion 114, Exhibit C, Affidavit of Jenna Hillesheim (Hillesheim Affidavit), Exhibit A, Hillesheim Email String, Email from Moore to Thompson, Danner, and Reeser dated April 23, 2013 at 2:07 p.m.  Moore was familiar with the Service Level Liaison duties because of his training and experience as a Business Analyst.  He offered to perform these functions for Server Hardware.

State Farm executive Dan Danner had authority over the Server Hardware unit. Danner states that he authorized Moore to perform these Business Analyst level Service Level Liaison functions as long has those functions took less than 50 percent of Moore's work time.  Motion 114, Exhibit D, Affidavit of Dan Danner (Danner Affidavit) ¶ 3.  Moore denies that he agreed with anyone to the 50 percent limit.  He denies that he had any type of formal agreement governing his performance of Service Level

Liaison functions.  <u>See</u> <u>Moore Deposition</u>, vol. 1, at 98-99; <u>Response 123</u>, at 33-36.  Moore stated in his deposition that his immediate supervisor Jenna Hillesheim and Server Hardware Service Manager Matt Spurgin authorized him to perform these duties.  <u>See</u> <u>Moore Deposition</u>, vol. 1, at 90-92.  Hillesheim reported to Danner at this time.  <u>Hillesheim Affidavit</u> ¶ 2.

Moore began performing Service Level Liaison functions shortly after his arrival at Server Hardware.  In January 2013, Moore initiated a conversation with Willis about a raise and a promotion.  Moore sent Willis an email dated January 25, 2013 regarding that conversation.  Moore wrote:

> Sir,
>
> On the subject of compensation that we broached yesterday. All we want to deal in is the truth.  If my impact to the team, since I joined, brought nothing more than any other SSS could bring, I have nothing further to say.  But if the impact of my presence has been much larger than that and I bring real value using my skillset I acquired as a successful Business Analyst…big difference.  At the very least, they should pay me the very top of the pay scale for the best of the SSS (retroactive from my arrival), until they acknowledge that I am performing as a level 3 Business Analyst based on their own criteria, then provide me with fair compensation for that.  Have a great weekend, sir.
>
> Keirand Moore

<u>Moore Deposition</u>, Exhibit 29, <u>Email String</u>, <u>Email from Moore to Willis</u> <u>dated January 25, 2013 at 10:43 a.m. (ellipsis in the original)</u>. Willis responded:

> Thank you for the write up. I will take this forward. ☺
>
> Thank you again.

<u>Id.</u>, <u>Email from Willis to Moore dated January 25, 2013, at 10:44 a.m</u>.

Moore was not promoted and did not receive a raise. Rather, Danner states that he stopped Moore from performing those functions because those duties were taking up more than 50 percent of Moore's work time. <u>Danner Affidavit</u>, ¶ 4. Danner states that he approved transferring the Service Level Liaison duties to an Analyst already on the Server Hardware team with the understanding that staffing levels would not be increased. <u>Danner Affidavit</u>, ¶ 6. Moore stated in his deposition, "[I]t was [Danner] who didn't allow me to continue the server hardware work because if he did, he would have to increase my salary and promote me . . . ." <u>Moore</u> <u>Deposition</u>, vol. 1 at 89; <u>accord</u> <u>Moore Deposition</u>, at 102-03.

Moore again denies that any 50 percent limit existed. <u>See</u> <u>Response</u> <u>123</u>, at 33-37, 42-43. In July 2013, however, Moore acknowledged the existence of the 50 percent limit. During a meeting with Danner in July

2013 after Moore stopped performing Service Level Liaison duties, Moore

stated that he learned from Danner that,

> I can be as "Remarkable" as I want to be, as long as it is for less than fifty percent of my time because the company doesn't want to 'compensate' me for outstanding work. That's what it sounded like you were telling me. I don't want to misconstrue, sir, is that correct?

Moore Deposition Exhibits, Exhibit 31, at 2 of 49, Email from Moore to

Danner dated July 16, 2013 at 2:24 p.m.

On April 17, 2013, Moore's direct supervisor Jenna Hillesheim and

Service Manager Matt Spurgin met with Moore.[5]  Spurgin had responsibility

for Moore's work assignments.  Hillesheim and Spurgin told Moore that a

Technical Analyst in the Server Hardware unit named Rob Probst was

being assigned to perform the Service Level Liaison duties that Moore had

been performing.  They asked Moore to assist Probst in the transition of

duties from Moore to Probst.  Motion 114, Exhibit C, Affidavit of Jenna

Hillesheim (Hillesheim Affidavit), ¶ 4.  Hillesheim states that Moore became

upset. Hillesheim states that Moore said he was not being recognized for

the work he was doing and also that Probst was not qualified to perform the

Service Level Liaison duties.  Hillesheim Affidavit, ¶ 6.  Moore states that

---

[5] Hillesheim reported to Danner from November 2012 to March 2014.  Beginning in March 2014, Hillesheim reported to Kristen Peters.  Hillesheim Affidavit, ¶ 2

he was more frustrated than upset.  He states that Hillesheim was unprofessional because she was "throwing her weight around without the benefit of knowledge" of the situation.  <u>Response 123</u>, at 47.

On the evening of April 17, 2013, at 10:57 p.m., Hillesheim sent Moore an email to memorialize the discussion.  Hillesheim indicated in the email that Moore's specific duties were classified as an Organizational Support Specialist (OSS) in Server Hardware.  The Organizational Support Specialist appears to have been a type of duty performed by System Support Specialists.  Hillesheim wrote:

> Many OSSs are asked to participate in the onboarding or transition process of team members.  Sometimes they are able to give more details than just documentation location, depending on the amount of knowledge they have acquired on the team.  So, please also provide any knowledge on existing relationships and information about your team's internal customers and upcoming facilitation meetings.  Allow the new team member, Rob, to ask questions as needed of you, and encourage other team members to answer his questions as needed also.  This information will also become useful for onboarding additional team members if that becomes needed. . . . .
>
> [I] expect a single source document with the information outlined below in the form of a transition plan for Rob.  We need for you to create one document that includes all of the necessary information, and for it to be effective.  This single source document transition plan needs to be available to Rob by 4/25/13.  In the transition plan, include the following:
>
> • The <u>knowledge</u> (by topic area) Rob needs to come up to speed on, what is happening within team, and where the team is headed with the work.

- The <u>documentation</u> that Rob needs to review or read and come up to speed, including <u>links</u> to appropriate team information.

  o Include any documents in draft mode that have not yet been stored for the team's access so Rob gets an idea of where the team is going next.

  o Include links to team SharePoint information and tools that are specific to the team.

  o Provide the distribution lists he will need to use as a team member in communications.

- Experiences that need shared. Experiences are valuable as well in the learning and in the transition. You should document time you plan to spend with Rob and time that he could spend with other team members gaining learning on specific topics pertinent to the team's work.

By the end of day Tuesday, 4/23/13. Please provide a draft of the transition plan to Matt and me so that we can review it and provide feedback on it. This will give time for us to get it ready to go for Rob on 4/25/13.

The competencies you will need to use in this transition are equally important as anything else that the team is doing. I'm expecting that your competencies in teamwork, inclusiveness, work ethic, communication and relationship building will be a large portion of the success of the transition of new team members to Matt's team. Thanks in advance for your help with the transition and your cooperation!! Please let both Matt and me know if you have questions.

<u>Hillesheim Affidavit</u>, Exhibit A, <u>Hillesheim Email String</u>, <u>Email from</u>

<u>Hillesheim to Moore dated April 17, 2013, at 10:57 p.m. (emphasis in the</u>

<u>original)</u>.

On April 22, 2013, Moore responded with an email.  <u>Hillesheim Affidavit</u>, Exhibit A, <u>Hillesheim Email String</u>, <u>Email from Moore to Hillesheim dated April 22, 2013 at 1:48 p.m</u>. Moore copied Spurgin, Server Hardware Business Analyst Michael Willis, and himself on the email.  Moore wrote:

> What I am attempting to do as I sit down to write this is explain the best way that I can that I can't deliver what you are demanding of me.  This is much bigger than just me.  I am including Michael Willis in this correspondence because he has some experience and knowledge about Service Management and can confirm what I am about to say to be the absolute truth.
>
> Please understand that Service Management is a "discipline".  It is complex.  It takes a lot of preparation to qualify for a process assignment if you are to do it properly.  One has to *learn* how to be a successful <u>Change Agent</u>, <u>Change Coordinator</u>, or a <u>Problem Coordinator</u>, <u>Problem Analyst</u>, I<u>ncident Coordinator</u>, etc.  Service Level Liaison is no different.  Without the proper background training, successful transition won't be possible.  You couldn't transition a good Problem Coordinator's work to a person who is starting from ground zero and leave them alone after a just few days or even a few weeks.  They will fail unless they have an available resource to go to for help.  They have to be allowed time to go to the classes and LEARN this discipline.  They need to sit with an experienced person to apply what they have learned into live action, hands on experience.  The same is true for <u>SLL</u> work.  Due to circumstances beyond my control, I won't be able to be that resource for Rob.  You want my hands off of it in a couple weeks.  At that point, he will be left <u>alone</u> with 21 service receivers, most, if not all with no valid agreements in place going forward and looking to Rob to make the next move.  By then, my hands will be tied by the very people who made the decision to take me out of the equation. Those 21 services are expecting to see an updated OLA in the near future.  No one can get him ready to write a draft of that document by May 1st.

Please understand that I am not defying you here, nor am I attempting to stay involved once I help Server Hardware over the hump on Thursday. You need a clear understanding of what Rob has waiting for him. I make it look easy, but it is far from it. When I said "Rob isn't qualified", it isn't that I am being disrespectful, arrogant, or flippant. I know it seems that way because of the way I communicated it due to my tremendous disappointment at that time. But what it really represented is my respect for the Service Management discipline. The very way that it's constructed will demand that you do too. You don't have to respect my high level of skill in this discipline, but you would be well advised to respect the discipline itself. It is designed to prepare a person for success in any process assignment. If it isn't done that way it's designed to, chances for failure increase dramatically. That won't be my fault. Nobody can change that process. I know that I can't. No one can quicken or shorten the process except for maybe ITIL. I don't think anyone else can. I don't think ITIL is planning to. I know that you don't think it's my place to say it, but it became my place to level with you when you gave me the directive to get him ready for or to even put him on the road to success without the right ITIL approved preparation.

Bottom line: I'm sorry, but I can't make Rob a SLL in two weeks, or even two months. No one can. All I can tell you is that he will have to do it the same way that the rest of the SLLs had to do it to be successful. That takes time and a lot of it. Time that I don't have. My involvement has to stop very soon and that's out of my control. He will need someone to sit with him, to mentor him. It's not the kind of work that you can just pass along without lots of preparation before a person can inherit the responsibility for a service the size of this one. I know what it takes to successfully run a service. I have done it before (Infrastructure Web - please contact Aaron Bonner for a reference). It is not easy at all. I can't say enough that he needs time to learn and to prepare to take over. If you don't replace me with someone of equal (or better) knowledge, experience, training you can't reasonably expect to get even close to the same quality of results for some time to come. According to that function, they can't spare a resource to help

him. That weight cannot fall on my shoulders. Like I said, it's a lot bigger than me. The SM function won't hesitate to let you know that qualifications to become a pro in this field are not to be taken lightly. Most people must put in the work.

Please understand that what you are demanding cannot be treated as if I was passing this work to on someone who has some Idea of what to do. The work is too advanced at this stage to do that and it's still in its early stages. That's why the method that you are demanding below will not be effective. I can't tell you how much time I plan to spend with Rob. He has to tell Matt how much time he has to spend with me. He has a full time job already. Now he has two. He and Matt have to make workload decisions. I can't give you any static timelines on when I can successfully transfer any knowledge. I can't predict how quickly he will pick it up inside a classroom setting, let alone just hanging with me unofficially. Please don't put me in that position. As the Service Design effort that I began picks up speed, the work will demand more and more of his time. The twenty-five percent of his time that he is being allotted with be eaten up with the classes that he will need to take alone. The SLL literally _runs_ the service. That is the person who is in <u>charge</u>. He/She reports to a SLM, but the SLL runs the service day to day, week to week, month to month, year to year. They report on the monthly metrics. They put out fires. They are accountable to the receivers. They write and maintain the OLA. They must explain why OLA goals are not met (If they are not at the end of the month) and what he will encourage his service to do to mitigate it during the following month. They negotiate and renegotiate with service providers and receivers regularly. They make deals and covenants with other areas. Depending on the service, some of this monthly reporting go all the way up to AVPs. The SLLs are the face of the service. They are the "go to" person. This work is demanding when it's done properly. Services that are smaller than Server Hardware often have two full time SLLs.

That what it takes to do it right and the right way is the only way, especially if I have to be involved. If I were to agree to your terms below, I am signing my own execution. You are

giving me a huge responsibility, but no time to carry it out the right way. He will fail if we do it your way and I don't want to suffer the consequences when that happens. That's why I'm giving you my professional response right now.

Please contact the Service Management function and ask them what it takes to be a successful Service Level Liaison. Matt, Michael and Rob will have to sit down and work out a time schedule for the course work that Rob will have to complete. I'm obligated to inform you that there are no shortcuts. It's the same thing that I and every SLL had to do. It's part of the Service Management structure. I am told that a lot of the SM training courses offered by SFLMS are full, but you may want to check periodically anyway. Perhaps he can get on the waiting lists. Until then, there isn't much that I can do for you. I know that some of the SLLs that I contacted regarding Service Design are novices. But they have a stronger support system in place than Rob will have and that what he needs. I had just begun to build that team, but I had no time to look into whose training for their process assignments were up to date. He needs that team behind him all of the way, ready to support and assist him, same as other SLLs have (especially beginners).

The SM function doesn't have anyone to help you right now and they can't tell you when they will. That's how much SM is in demand. You might consider being guided by that. People in the know are aware that they need the things that SM offers and they're all trying to go to the head of the list ASAP. There are not enough resources available to help everyone who wants It and knows that they need it. The line is around the comer. That's how important SM is to Systems. That's one of the reasons that I stepped up. That's what SF says they want.

Also, you can't ever transition a relationship. Relationships have to be built by the participants. I can introduce you to someone. But how they perceive you and the direction that the relationship takes from there cannot be on me. I am powerless to affect it once an intro is made. They will know that they can't work with Rob the way that they can work with me until he is ready. It will take a while. I can't take responsibility for that.

We will fail.  Here is an example of what I mean: << Message: RE: I/A: Server hardware Service Design & Test Center >>. They are looking forward to the partnership because they think they will be working with me.   Rob's inexperience, through no fault of his own, will put this on hold until he can get some formalized training and a mentor.  I can't begin to project how long that will take.  Too many factors that are out of my control are being placed on me as responsibilities.  I have no idea if any headway can be made by May 1st.  I doubt it.  But In those few days, whatever I can give him won't be enough.  For his sake, you might want to rethink how you want to handle this.

The  actions of person(s) who are holding me back are far reaching.

- They are also affecting Server Hardware, who was making real progress, in a negative way.

- Server Hardware was a service that the function recognized as one that the didn't have to worry about.  It was a service that was moving pretty far up the road to being fulling functioning and closer that some others to being up and running.  Now it's just another service on the long waiting list for Service Design. (please contact Michael Willis for verification.  He was the person who told me that SH was performing above function expectation, unless I misunderstood him).

- This service was gaining notice from other services too.  It was being held up as an example for other services going forward due to the results of my efforts according to Angela Moon (SLL for Test Center).

- Janet Canfield (SLL for Test Center) was mentioning this service a one to watch during a meeting of services that are all seeking Service Design. That's too much responsibility to transition to Rob who hasn't even had his first SLL course yet. I hope you can see why I can't help you with that.

If you plan to seek assistance on what you can do to keep all of the work that I have started from slipping into oblivion, you must go to a professional (a level 3 or 4 Analyst).  I will already be out of time by the time you reach one and get a response.  If they refer you to ask any SLLs who know me, you may not want to use my name. If they think that I am accessible to you, they will likely send you right back to me for guidance on how to run your service, the very thing that you don't want.

I know that the person(s) who are holding me back may not want to acknowledge me as anything more than just a "support" person.  But my professionalism and expertise is undeniable when you look at where Server Hardware is now compared to Where they were before me.  The magnitude of Thursday's meeting speaks for itself as does all of the work that I have done for them.  It takes a whole different skillset to get the ISCs as excited as they are to bond with us the way they want to. That's take part BASE training, part communications expertise and part instincts. The success of the ISC relationships depends on successful Service Design.

I ask that you please share this information with Rob.  He deserves all of the facts.  I ask that you please let him decide if he wants to take this on, because there's going to come a time that he will likely have to choose between what he's doing now and this work.  If it keeps moving forward, he won't be able to do both. He's going to need to take on a lot of course work and mentorship along with his fulltime job now.  Maybe you'll want to let him know what he is in for.  That's the only transition thing that I can do for him that's going to be fair to both him and me. Telling everyone the truth is critical.  It's impossible to transition seven months of highly professionally executed work to him now and then leave him alone with it.  I owe it to him to give him all of the facts.  The way you are wanting this to be done means that nobody is going to win.  Not Rob.  Not me.  Not Server Hardware.  Not the four data centers. Nobody.  But I know that it's not my concern.

I know that you are angry with me for telling you this.  I'm not just saying all of this as retaliation for my work being hijacked.  It isn't my motive.  Before you discipline me, please forward this e-mail to anyone who needs to see it, especially the people who made this decision.  They should know the consequences for their actions, if they don't already (if they even care).  You need a more effective contingency plan.  No matter if the decision about my involvement changes or not is irrelevant to this situation.  You can choose to just let that work dissipate or to keep it going as you see fit.  You had a professional, highly respected SM resource at your disposal.  That put you ahead of a lot of other services.  But for whatever reason, you don't want him.  I advise you to take particular notice of how everyone around you is prioritizing SM work.  There is a reason for it.

I have to log off now.  Super heavy stress aggravates my symptoms.  I don't feel well right now.  I am going to take PSL.  I have to let all of this go for right now.  If I log back on before EOD, I will let you know.  If not, I will update EAS in the morning.

I had to get this off of my chest It is weighing heavily. I will still have enough time to put things together for Thursday.  Now that I have unburdened myself, I can focus full force in the morning, have something to show Matt and Michael on Wednesday afternoon, and be ready to present on Thursday morning.

Id. (emphasis in the original).

Spurgin responded to Moore's email:

Neither Jenna nor I have had the expectation that you would train Rob to be a fully functioning and experienced SLL in a few weeks.  That is not realistic.  However, I do feel that It is realistic over these next few weeks for you to do the best you can to mentor and educate Rob on the SLL work that you have done specifically for our team.  I fully understand that Rob needs to take the training, that he needs time to learn the specifics of the SLL assignment, he needs to build partnerships

with service providers and receivers, etc.  Jenna and I have both told you that we understand that Rob is new and will need time to learn, and Michael and I have discussed that as well. After we get through the session with the ISCS on the 25th you should have plenty of time to work with Rob.  I expect Rob to reach out to you, and for you to reach out to Rob...any transition/mentorship is a joint responsibility and effort.  Let me know if you have any further questions about what is expected of you with regards to the transition work, thanks.

Hillesheim Email String, Email from Spurgin to Moore dated April 23, 2013 at 10:39 a.m. (ellipsis in original).

Less than four hours later, Moore wrote an email to Assistant Vice President Terry C. Thompson, Danner, and Kevin Reeser.  Reeser was Spurgin's supervisor.  Moore Deposition, vol. 2, at 239-40.  Moore wrote:

Gentlemen,

I am being used, abused and taken advantage of.  I'm afraid that I can no longer stand for that. This all started because in spite of everything that has happened to me over the last four years here at State Farm I was still willing to do my very best for the company as an employee.  I have noted all of the things that I have read about your demand for "remarkable" service.  I absorbed what is documented in your obligations of leadership and a lot of the other statements about the company and employee relations that are published on the intranet.

I was unjustly demoted from a Business Analyst to a Systems Support Specialist because I was forced to work under conditions where the people in charge showed no respect for the company's documented "Obligations Of Leadership".  That and other related issues are currently the focus of a Human Resources investigation that has been going on for nearly a year now.

While working as a "SSS" I discovered a gap with the operations of the Server Hardware team.  The team is top heavy with brilliant technical minds, but very thin on business representation.  I discovered that they need both.  So I volunteered to show them how much better they could operate under my business leadership.

- They had a problem with having enough testing time for ESR. I volunteered to help them out.  I filed a risk on the project. They didn't think it would matter.  It fixed their problem.

I stepped up like State Farm says that they want their employees to do. "Go above and beyond" they say.  I volunteered to help them.  They didn't object. They agreed.

- Next I saw that they were operating as a "service" without having valid agreements with any service receivers. They didn't even have the proper level of service/availability listed for their own service.  They didn't even seem to know what that was.  I brought it to their attention.  I stepped up.  I started to successfully re-build their service.  I have initiated Service Design and started reaching out to their receivers about building an effective Service Management relationship/partnership and getting favorable responses in return.

- They had a rather unproductive relationship with the data centers leaders.  I volunteered to help them build a partnership with the ISCs.  I devised a whole new way of approaching the data centers.  I devised a way for them to gather information effectively without the argumentative obstacle that they said always got in their way in the past.  So far, my way is producing results well beyond their expectations because they had none.  Now that they have benefitted from my professionalism, they have **_high_** expectations.

- The data center leaders are here in Bloomington.  Because of my efforts, we are meeting with them on Thursday.  Never

before have the ISCs been so excited about the partnership that I was leading the construction of.  I set up a meeting for one hour.  But they are going to spend two hours with Server Hardware while they are here to further build the business partnership that I changed from adversarial to productive.

Now that I have done all of this for them, they are taking the work away from me.  The say that someone made the decision that "support people should only do support work".  I know of several SSS who are working on development opportunities.  I haven't heard a single one of them talking about being taken off of their dev opps so that they could do support work.  If that was happening, word would have been circulating throughout that community.  Not even so much as a whisper.

Let's be straight.  They did nothing develop me on Server Hardware.  I am the one who was developing them.  They had no clue what they were missing.  Now that I began showing them the way, they want squash me, and demand that I *mentor* an **analyst** to do **3rd level analyst work**, from an **SSS** seat, for **SSS** pay!  And it's not even close to the top SSS dollars!  I have been doing this work for them for about eight months.  I hope they will not insult us by saying that it wasn't quality work.  Can anyone please explain to me how they can possibly have an ***"expectation"*** that a SSS mentors an analyst on how to be an effective, high performing analyst?  Please help me to understand what sense that makes in the meantime, as a reward, I get knocked out of an opportunity that I created so that someone else can get it who may not even want it.  Seriously?  Can we please discuss this?  I'm confused on the ethics.  The work was in very capable hands and moving forward beautifully.  But they are taking it from those capable hands to give it to a person who hasn't even begun to train for the role.  On top of that, they demand that I help them to hold myself down in the SSS role and keep me from receiving the recognition and compensation that I worked for, earned, and deserve.  That is incredible!  Can you help me discover what the purpose of this move was if not to keep me down?  Feels like a ceiling to me.  Please help me to unravel the motivation

behind this.  If you three can't help me, will you please put me in touch with someone who can?

Let's also be clear that it wasn't a stretch assignment either. There was no agreement between Matt, Jenna, and the manager of a Service Level Liaison that I would be mentored for a specified period of time, for an identified percentage of my time and the mentor's time.  None of the elements of a stretch assignment or a dev opp were ever discussed to that extent. That could be because I'm doing all of the developing and all of the mentoring and now they are demanding more of my time and talents before they discard me.

They allowed me to perform *independently* as a **lead** analyst (making my own moves and decisions) and reaped the benefits from it for about eight months, just under full time each week, without paying me close to the industry standard for that work. I believe that's against the rules.  I deserve much better treatment than that.  And they knew the whole time what I *was* doing.  No secrets.  They knew how much time I was spending on it also. Wow!  The level of disrespect for me is stunningly disappointing.  They are showing absolutely no regard to how this is effecting (sic) me at all.  They are showing no regard for how this could affect State Farm either.

When I read mister Spurgin's note below: this is what I heard: *We demand to continue to use you and the benefit of your experience, knowledge and expertise without giving you the proper compensation or the recognition that you deserve for all you have done for us up until this point.  At first we were going to give you until the the 25th to transition the work, then May 1st, now we're going to change it to "over the next few weeks".  We acknowledge the value of the work you did, how well you did it and we want to continue to capitalize on your knowledge and experience.  But we don't want you to have the opportunity. When we're done with you, oh well...*

I am not being taken off of the work for reasons of incompetence.  I'm not being removed because I hit a plateau and can't take it further.  I can take it all the way a they know it.

That is why they are insisting that I **_mentor_** their replacement. I am being taken off of this work so that I can be held down to only do support work that I'm not trained for. If that's not why, what is the reason? Wouldn't you like to know too? They should tell us.

What do you hear when you read it? I still have yet to hear the business reason for why I shouldn't be allowed to continue to do my best work for State Farm. Why am I being kept down? Maybe they don't believe that I deserve an answer. Do you?

From the Obligations of Leadership statement:

**"Have right people in the right place at the right time with the right skills"…"Personally know your high-potential and high** perf*orming employees and ensure they are provided significant growth opportunities...*

Does that "Obligation not include me? If not, why not? So far, it doesn't seem to.

The work that I was doing was leading Server Hardware to: *"Achieve our Availability* & *Performance Goals for our critical business workflows".* And *"Increase* the capacity *and agility of our workforce"…* 2013 Planning Message… which also states: *"Systems is fully committed and accountable to deliver on these promises".*

I was moving them toward that. Is denying me a fair chance to advance using my skills worth not delivering on the Planning message when you have the chance, If I can help you do that? I guess it is.

I don't want to be used anymore. They would not be on the path they are on now, if it wasn't for me. I want to be respected for the talented professional that I am. I don't want to be held back and into obscurity after all that I have done for Server Hardware. And this is the thanks I get? I want to know why? Don't you? Please see what I wrote to Jenna and Matt below about their transition demands. Maybe you can understand

what I am telling them about Service Management and what it takes to do what I do.  Maybe you can help me explain it better.  They are still demanding.  Please help me.  I am in a very undesirable and impossible position.

This treatment of me is horrendous.  Please join me in doing the right thing. State Farm guarantees better for those of us who are trying to give our best all day, every day. Please help to make good on that guarantee.

I await your responses.

Thanks,

Keirand

Hillesheim Affidavit, Exhibit A, Hillesheim Email String, Email from Moore to Thompson, Danner, and Reeser dated April 23, 2013 at 2:07 p.m.  Moore did not prepare the memorandum that Hillesheim instructed him to prepare.  Moore did not provide any assistance or advice to Probst in taking over the Service Level Liaison functions.  Moore did not receive any formal discipline for not complying with Hillesheim and Spurgin's instructions.

In July 2013, Moore complained to Danner about what he called "workplace bullying."  Moore complained about the treatment since his 2009/2010 negative evaluation through his experiences with Seidner and Davis in 2011-12 leading to his demotion, and his experiences with Hillesheim and Spurgin in 2012-13.  Moore found Danner's response unsatisfactory.  Moore then contacted Senior Vice President of Systems

Mark Oakley, Senior Systems Executive Duane Farrington, Systems Executive Diane Fleming, and Systems Executive Sandy Arnold. <u>See Moore Deposition Exhibits</u>, Exhibit 31, <u>Email from Moore to Danner dated July 16, 2013 at 2:24 p.m.</u>; and Exhibit 32, <u>Email from Moore to Mark Oakley, Duane Farrington, Dianne Fleming, and Sandy Arnold dated July 21, 2013, at 9:28 p.m.</u>  <u>See</u> also <u>Moore Deposition</u>, vol. 2, at 240-42.

On July 22, 2013, Moore met with Human Resources representatives Omar West, Diann Savage, and Jessica Fentress.[6]  Moore was again unhappy with the response of West, Savage, and Fentress to his complaints.  On July 25, 2013, Moore again wrote to Systems Executives Oakley, Farrington, Fleming and Arnold.  <u>Moore Deposition Exhibit 32, Email from Moore to Oakley, Farrington, Fleming and Arnold dated July 25, 2013, at 2:57 p.m.</u>  <u>See</u> also <u>Moore Deposition</u>, vol. 2, at 240-42.  Moore again restated his experiences since 2009-2010.  On July 31, 2013 Moore wrote to Human Resources executives Annette Martinez, Mary Schmidt, Stacie Rood, and Mary Crego.  <u>Moore Deposition Exhibits</u>, Exhibit 34, <u>Email from Moore to Martinez, Schmidt, Rood, and Crego dated July 31, 2013 at 4:05 p.m.</u>  Moore complained about the response of Human

---

[6] <u>See</u> <u>Motion 94</u>, at 22 of 31 for spelling of Savage's first name.

Resources personnel West, Savage, and Fentress at the July 22, 2013 meeting regarding Moore's complaints.

On August 1, 2013, Oakley responded to Moore.  Oakley stated that Human Resources and the Employee Relations Investigations Team was looking into his complaints.  <u>The Moore Response Doc #65 (d/e 75)</u>, attached Email String 75-19 at page 6 of 7, <u>Email from Oakley to Moore dated August 1, 2013 at 7:18 a.m</u>.

On August 8, 2013, Moore wrote an email to Assistant Vice President Terry Thompson complaining about his treatment.  <u>Moore Deposition Exhibits</u>, Exhibit 35, <u>Email from Moore to Thompson dated August 8, 20913 at 3:26 p.m</u>.  Moore again repeated his complaints of bullying during his time on the Server Hardware team.

On August 9, 2013, Hillesheim provided written comments on Moore's work performance as part of his performance review process.  At the time, Moore's Performance Cycle was from December 1, 2012 through November 30, 2013.  Hillesheim's August 9, 2013 comments were part of the mid-cycle review.  The review process included a mid-cycle review and final review.  Hillesheim commended Moore for performing Service Level Liaison work.  Hillesheim also criticized Moore as follows:

> Feedback suggests that Keirand is "remarkable" except for
> when he is asked to do something he does not want to do

within his duties, and his behaviors are then not as remarkable. Examples of this provided in feedback included:

-taking care of paper for each ESR cycle that his assigned team currently does.  He has told the team he was too busy to do a piece of work that according to a key team member, would have taken "an hour every 4 months to complete".

Another feedback comment stated "I think he needs to focus more on his current work and not get too hung up on what he used to do or will do in the future.  A different team member commented they would not want Keirand on the team due to too much drama.  They stated Keirand is "capable of doing support work, but is focused on the higher level work, and it's not what we need."

Another person commented, yes, remarkable, "but too extreme and focused on doing the right thing, but at the wrong time and in the wrong way."

My observations of Keirand tell that he needs improvement in his teamwork, adaptability, and self-awareness regarding interactions with co-workers when he is to do something that he does not want to do.  Part of his growth in this performance cycle will be his ability to change and be consistent with the remarkable behaviors, regardless of what change-related company, team or role information or direction is being given.  If Keirand addresses his brand with some self-awareness on his reactions toward others on change-related information, this will help him improve competencies and meet expectations.  I believe Keirand has the ability and drive to meet expectations in the competency areas during the second half of the performance cycle.

Hillesheim Affidavit, Exhibit B, Employee Performance Results Tool covering December 1, 2012 through November 30, 2013 (Moore 2013 Review Tool).[7]

On or about August 20, 2013 State Farm Employee Relations Investigator Denise Richards-Rival interviewed Moore by telephone about his complaints of workplace bullying. See Moore Deposition, at 97; Moore Deposition Exhibits, Exhibit 36, Invitation for Phone Interview; and Exhibit 37, Email from Moore to Richards-Rival dated August 21, 2013 at 3:41 p.m. Moore states that Richards-Rival's "mind was already made up" about him before they met. Moore states that their conversation was fruitless. Response 123, at 59.

On October 15, 2013, Moore wrote another email to Assistant Vice President Thompson complaining about workplace bullying. Thompson thanked him for his email and told Moore, "I'm working with HR on getting a meeting scheduled to address your allegations. Expect an invite in the near future." Moore Deposition Documents, Exhibit 39, Email between Thompson and Moore dated October 15, 2013.

---

[7] The Employee Performance Response Tool erroneously lists the performance cycle as December 1, 2011 to November 30, 2012.

On November 13, 2013, Moore met with Thompson and Heather

Honeycutt, Director—Human Resources Client Services.  Honeycutt sent

Moore an email after the meeting.  Deposition Documents, Exhibit 40,

Email from Honeycutt to Moore dated November 13, 2013 at 11:33 a.m.

Honeycutt wrote:

> Thank you for taking the time to meet with Terry Thompson and
> me today.  In our conversation we discussed the disposition of
> the reviews conducted based on the concerns you brought
> forward.  As discussed, your concerns were thoroughly looked
> into separately by HR Line Services, Employee Relations and
> Auditing.  Each resulted in the same finding – namely, that your
> concerns of policy violations were not substantiated.
>
> As discussed, it is State Farm's expectation that you focus on
> your work and follow the direction provided by leadership.
> While you may utilize the Open Door Policy regarding any new
> issues you may have concerns with, it is not within the spirit of
> the policy to continue to raise the same issues that have
> repeatedly, and thoroughly, been looked into and found to be
> unsubstantiated.  Therefore, it is State Farm's expectation that
> you cease raising these same issues.

Id.

On November 15, 2013, Moore began preparing a charge of

discrimination to file with the Illinois Department of Human Rights (IDHR)

alleging racial discrimination.  Moore Deposition, vol. 1, at 123-24, vol. 2, at

200-01.  Moore did not allege racial discrimination or racial harassment in

any of Moore's internal complaints prior to this time.  Response 123, at 69-

70; <u>Moore Deposition</u>, vol. 1, at 128-29. Moore did not file a charge of discrimination at this time.

On December 12, 2013, Hillesheim gave Moore his end of the year review. Hillesheim gave Moore a Level 2 rating for Results and a Level 1 rating for Competencies. <u>Moore 2013 Review Tool</u>. Hillesheim commented on Moore's performance:

> Throughout this performance cycle, Keirand has demonstrated some competencies as noted above. However, other competencies have not consistently met expectations throughout this cycle. For example, regarding adaptability, Keirand has not demonstrated acceptance or support of changes regarding his assignments. This occurred when Server Hardware work was being changed, and I needed him to focus on the most critical work and shift some support priorities. He was also resistant to start work he was given in the Testing Area; this created disruption and delays in work being completed, started, or transitioned. Feedback indicates a lack of ongoing and consistent interaction with Keirand that negatively impacts his communication with the team members and his management. For example, I have asked Keirand many times to check in with his team leads each morning when he is working from home so that we know whether or not he is able to do work for a given day. After repeated requests, he complied. Keirand has also not balanced his workload after repeated instructions and directions from his supervisor on how to do so.
>
> Keirand does not easily accept and support changes that he doesn't agree with or does not like, even when those changes are directed by management. When this happens, Keirand loses focus on teamwork and business goals. Feedback indicates Keirand's negativity negatively impacts team moral. For example, feedback received noted Keirand interrupts work of other team members to focus his complaints about his work

and management. This negatively impacts his professional relationships and does not create mutual trust with his team members or leadership.

Keirand needs to focus on self-improvement, following direction and adapting to change for the next performance cycle. My experiences with Keirand are that he does not receive information or performance feedback in a non-defensive manner, whether it is performance feedback or information to help him gain another perspective. He can benefit from analyzing his own behavior and performance to learn from his mistakes and successes this year.

Moore 2013 Review Tool.

On December 24, 2013, Moore filed a charge of discrimination with the IDHR and the Equal Employment Opportunity Commission (EEOC). Moore Deposition Exhibits (d/e 109), Exhibit 43, Charge of Discrimination dated December 24, 2013 (December 2013 Charge). Moore alleged several acts of race discrimination and retaliation. Moore alleged that he was "Denied promotion continuing through 11/13/13" because of race discrimination and retaliation. In the December 2013 Charge Moore alleged he "initiated a formal complaint of civil rights violation with Respondent on 04/2012." He alleged he was denied a promotion because of his race and in retaliation for asserting the civil rights complaint. Moore alleged he was subject to "Harassment continuing through 11/13/13 related to race, Black." He alleged "I was subject to harassment continuing through 11/13/13. Specifically, I have been forced to have to mentor the

new Business Analyst."  Moore also alleged that the harassment was in retaliation for "my opposition to racial discrimination within such period of time as to raise the inference of retaliatory motivation."  <u>December 2013 Charge</u>.  Moore selected the November 13, 2013 date based on Honeycutt's email sent that day.  <u>Moore Deposition</u>, vol. 1, at 115.

Moore testified in his deposition that the April 2012 formal complaint of civil rights violation referenced in the December 2013 Charge was, in fact, the May 1, 2012 Letter set forth in full above on pages 7 and 8, in which he asked for an investigation of his 2009/2010 annual review.  <u>Moore Deposition</u>, vol. 1 at 161.  Moore did not mention race discrimination in the May 1, 2012 Letter or the follow-up email he sent the same day to Omar West of State Farm Human Resource Department, also quoted above.  In fact, prior to the filing of the December 2013 Charge, Moore admits he did not complain to anyone at State Farm about racial discrimination in his employment.  <u>See e.g.</u>, <u>Response 123</u>, at 43, 69, 81; <u>Moore Deposition</u>, vol. 1, at 128-29.

After the December 2013 Performance Cycle review, Hillesheim required Moore to complete a work-tracker document to document the duties he performed during the workday.  Due to Moore's Chron's disease and related medical conditions, he often worked half days or split his

workday into working at the office half days and working from home half days. Hillesheim states that Moore resisted preparing a work-tracker document. She states that Moore prepared a work-tracker but did not follow the template Hillesheim provided. Hillesheim Affidavit, ¶ 15. According to Hillesheim, Moore "decided to make a mockery of it and record details in bold red font of your restroom breaks, going to the ice machine, and removing your coat." Hillesheim Affidavit, Exhibit C, March 10, 2014 Memorandum. Moore states that he was opposed to preparing a work-tracker document but complied with Hillesheim's demand. See Response 123, at 68-69.

On February 26, 2014, Service Manager Wendy Satchwell sent an email to Moore. Satchwell directed Moore to perform some filing and other clerical duties. On February 27, 2014, at about 8:00 a.m., Satchwell came to Moore's desk. At that time, Moore worked half days at the office due to his Chron's Disease. By that time, Hillesheim did not allow Moore to work from home. See Moore Deposition, vol. 2, at 168-69, 212-13. Satchwell said she asked how things were going. Moore stated that she put her hands on him in an offensive way and committed a battery on him. See Response 123, at 71-72. Moore then sent Satchwell an email response to her email of the day before. Moore stated that he was not trained to

perform the assigned duties and he did not have time because he had

other duties and he was only working half days.  Thirty minutes later,

Server Hardware team member Robin Nerby sent Moore an email

informing him that he had been trained to perform the tasks outlined by

Satchwell.  Nerby offered to show Moore again how to perform these

duties.  Moore responded that he did not remember any of the training.

Hillesheim viewed Moore's response as defensive and negative in tone.

Hillesheim Affidavit, ¶ 18 and Exhibit C, Email String.

On the same day, February 27, 2014, Hillesheim met with Moore.

Satchwell and Human Resources representative Jessica Fentress attended

the meeting.  Hillesheim states that she told Moore she received feedback

that his communications with co-workers had been defensive and negative

in tone.  Hillesheim told Moore that she wanted him to communicate with

co-workers collaboratively and professionally.  Moore disputes that he ever

was unprofessional with his co-workers.  See Hillesheim Affidavit ¶ 19;

Response 123, at 72-74.

Later the same day, February 27, 2014, Moore spoke privately to co-

worker Cathy Cooper.  Hillesheim states that Cooper reported to Hillesheim

that Moore confronted and intimidated Cooper and asked if she had a

problem with him.  Moore disputes this characterization of this event.  He

states that he and Cooper were friends, but Cooper had betrayed that

friendship.  He talked to her to confirm that betrayal and to end any

friendship between them.  Hillesheim Affidavit ¶ 20; Response 123, at  74-

76.

On March 10, 2014, Hillesheim prepared a memorandum (March 10,

2014 Memorandum) addressed to Moore with a subject of "Inappropriate

Behavior."  The March 10, 2014 Memorandum summarized Hillesheim's

concerns with Moore's behavior since the end of his December 2013

Performance Cycle.  Hillesheim summarized his failure to comply with her

request to keep a work tracker document properly and his behavior on

February 27, 2014.  The March 10, 2014 Memorandum ended with this

statement:

> Keirand, you are ultimately responsible for your behaviors. If
> immediate and sustained improvement is not seen, further
> disciplinary action up to and including a recommendation of
> termination may occur. By signing below, you acknowledge that
> you have had an opportunity to review and have received a
> copy of this memo. (emphasis added)

Hillesheim Affidavit, ¶ 21 and Exhibit D, March 10, 2014 Memorandum.

The March 10, 2014 Memorandum had signature blocks at the end for

Moore and Hillesheim to sign.

On March 15, 2014, Kristen Peters became Hillesheim's supervisor.

Motion 114, Exhibit A, Affidavit of Kristen Peters (Peters Affidavit), ¶ 2.

On March 21, 2014, Hillesheim and Human Resources representative Omar West met with Moore to discuss the matters set forth in the March 10, 2014 Memorandum. Hillesheim states that she started with a discussion of the work tracker document. She states that Moore became defensive. He refused to answer questions. Hillesheim states that she believed raising additional issues would have been unproductive. She did not present Moore with the March 10, 2014 Memorandum. Instead, she and West recommended that Moore be put on paid administrative leave pending further review of his behavior. Hillesheim Affidavit, ¶¶ 22-23. Moore disputes Hillesheim's characterization of the meeting. See Response 123, at 77-80. Moore states that he told Hillesheim and West that he was going to file more charges of discrimination. Moore Deposition, vol. 1, at 126-28; Motion 94, at 17 of 31. Peters approved the request and authorized Hillesheim to put Moore on paid leave on March 21, 2014. Peters Affidavit, ¶ 3; Moore Deposition, at 18.

Shortly thereafter, Hillesheim recommended terminating Moore's employment based on his behavior at the March 21, 2014 meeting. Hillesheim Affidavit, ¶ 24. Peters agreed with the recommendation. Peters Affidavit, ¶ 4. On April 4, 2014, Moore was notified that his employment at State Farm would end. He could retire effective May 1, 2014, or he could

elect not to retire and be terminated effective April 7, 2014. Moore did not want to retire, and so, State Farm terminated his employment. Moore Deposition, at 19-22.

Moore filed additional charges of discrimination with the IDHR and EEOC which were signed by Moore on April 4, 2014 and April 29, 2014. Moore Deposition Exhibits, Exhibit 45, Charge of Discrimination dated April 4, 2014 (April 4 Charge); and Exhibit 46, Charge of Discrimination dated April 29, 2014 (April 29 Charge). The Charge signed by Moore on April 4, 2014 shows it was received by the IDHR on April 7, 2014. Moore alleged retaliation and harassment in the April 4 Charge. He alleged that he was subjected to harassment on February 26, 2014. He alleged, "one of my managers aggressively approached me, grabbed my shoulders and pushed me towards the work area." He alleged the manager did this in retaliation for his filing the December 2013 Charge. Moore also alleged that he was put on administrative leave in retaliation for filing the December 2013 Charge. April 4 Charge.

Moore alleged in the April 29 Charge that he was fired because of his race and in retaliation for filing the December 2013 Charge. Moore alleged he filed two prior charges of discrimination, but he had only filed the December 2013 Charge before he was notified that he was terminated.

April 29 Charge.  Moore filed the April 4 Charge on the same day he was notified of the termination of his employment.

On January 16, 2015, the EEOC issued Moore three right to sue letters, one for each charge.  Complaint (d/e 1), attached Right to Sue Letter; State Farm's Motion to Dismiss (d/e 19), Exhibits 1, 2, and 3, Right to Sue Letters.

PROCEDURAL HISTORY OF MOORE'S CLAIMS

Moore brought this action on February 3, 2015.  Moore alleged numerous claims for violations of his rights under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq.; the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111 et seq.; and the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq.; and state-law claims. See Complaint (d/e 1).  The Court entered partial summary judgment on some of Moore's claims, and Moore agreed to dismiss his FMLA claim. Order entered December 22, 2016 (d/e 49); Order entered May 22, 2017 (d/e 57); Order entered June 13, 2017 (d/e 61); Order entered February 23, 2018 (d/e 79); and Agreed Order to Dismiss FMLA Claim entered May 9, 2018 (d/e 103).  The following claims for race discrimination and retaliation in violation of Title VII remain:

- Moore claims he was discriminated against when (1) he was denied a promotion continuing through November 13, 2013; (2) he was forced to monitor Business Analyst Probst through the same time period; and (3) he was discharged on or about April 7, 2014.  Moore also claims that forcing him to mentor Probst was harassment in violation of Title VII.

- Moore claims he was retaliated against in violation of Title VII by (1) being denied a promotion continuing through November 13, 2013; (2) being forced to mentor Business Analyst Probst through the same time period; (3) being placed on administrative leave on March 21, 2014; and (4) by being discharged.

Order entered February 23, 2018 (d/e 79), at 11 (incorporating by reference the list of remaining claims set forth in State Farm's Motion for Summary Judgment on Moore's Breach of Contract Claim (d/e 67), at 4).

## ANALYSIS

Both parties seek summary judgment.  At summary judgment, the moving party must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-

24 (1986). The Court must consider the evidence presented in the light most favorable to non-moving party. Any doubt as to the existence of a genuine issue for trial must be resolved against the movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once the movant has met his or its burden, the non-moving party must present evidence to show that issues of fact remain with respect to an issue essential to his or its case, and on which he or it will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In this case, State Farm is entitled to partial summary judgment on Motion 110 for Moore's claims related to events culminating in the 2012 demotion. State Farm is also entitled to summary judgment on Motion 114 on all of Moore's remaining claims.

State Farm's Cross-Motion for
Summary Judgment on Events Leading Up to and
Culminating in the July 2012 Demotion (Motion 110)

State Farm seeks summary judgment on Moore's claims for events that led up to his July 2012 demotion because Moore failed to file a timely charge of discrimination with respect to those events. The Court agrees. Title VII requires a plaintiff to exhaust his administrative remedies before filing a civil action under Title VII. A plaintiff must first file a charge of

discrimination within 300 days of the discrete act of discrimination or retaliation with the EEOC or parallel state agency, in this case the IDHR. 42 U.S.C. § 2000e-5(e)(1). Moore filed his first Charge on December 24, 2013. He first spoke to a representative of the EEOC or IDHR on November 15, 2013. Even if the Court counted the statute from the November 15, 2013, Moore may only bring claims that arose within 300 days of that date, or after January 17, 2013. Moore was demoted in July 2012. The charge was not filed within the required time limit.

Furthermore, the December 24, 2013 Charge does not mention the 2012 demotion. The charge alleged violation from a failure to promote through November 13, 2013, and harassment through November 13, 2013. The failure to promote consisted of the decisions by Danner, Hillesheim, and Spurgin not to promote Moore in the Server Hardware unit to a Service Level Liaison position in 2013. Moore Deposition, vol. 1, at 112. The harassment consisted of requiring Moore to mentor Probst as the Service Level Liaison on the Server Hardware team. See December 24, 2013 Charge. In fact, none of Moore's three Charges of Discrimination mentioned the July 2012 demotion. See December 24, 2013 Charge; April 4, 2014 Charge; and April 29, 2014 Charge. The scope of a plaintiff's Title VII claim is limited to the wrongful acts alleged in the charge. "[T]he charge

must, at a minimum, describe the same conduct and implicate the same individuals." <u>Huri v. Office of the Chief Judge of the Circuit Court of Cook County</u>, 804 F.3d 826, 831-32 (7th Cir. 2015).   The acts by Seidner and Davis in 2011 and 2012 are not described or implicated in any of Moore's three charges.  Therefore, any Title VII claim regarding the July 2012 demotion is barred for failure to file a timely charge of discrimination.  Moore's arguments to the contrary are not persuasive.  State Farm is entitled to partial summary judgment on Motion 110.

<u>State Farm's Cross-Motion for Summary Judgment<br>
on All Remaining Claims (Motion 114)</u>

<u>Discrimination</u>

To overcome summary judgment on his Title VII discrimination claims, Moore has two options.  First, he may present evidence that shows (a) he was performing his duties satisfactorily, (b) he suffered an adverse employment action, and (c) the individuals who subjected him to the adverse employment action did so because of his race.  The Supreme Court referred to this option as the direct method.  <u>Young v. United Parcel Service, Inc.</u>, __ U.S.__, 135 S.Ct. 1338, 1345 (2015); <u>see</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).  Moore may also use an "indirect" burden-shifting method.  He may present evidence that (a) he was performing his duties satisfactorily, (b) he suffered an adverse

employment action, and (c) similarly situated employees who were not black did not suffer such an adverse employment action. If Moore can present evidence on these issues, State Farm may state its non-discriminatory reason for the adverse employment action. Once State Farm has so stated, Moore must present evidence that State Farm's stated reason was a pretext, that is a lie. Young, 135 S.Ct. at 1345; see Millbrook v. IBP, Inc., 280 F.3d 1169, 1175 (7th Cir. 2002) (pretext means a lie).[8] If Moore can present such evidence, then he may overcome Motion 114. State Farm can overcome Motion 94 if it can present evidence that disputes whether Moore can establish any elements on which he has the burden of proof in either the direct method or the indirect method.

The Seventh Circuit has clarified that a party may use any type of admissible, competent evidence (e.g., eye witness testimony, documents, direct evidence, circumstantial evidence) to meet its burdens under either the direct method or the indirect burden-shifting method. See David v. Board of Trustees of Community College District No. 508, 846 F.3d 216,

---

[8] State Farm argues throughout that Moore failed to present evidence that he was performing his duties satisfactorily. Moore disputes this issue. The Court does not address this issue because Moore's discrimination claims fail for other reasons discussed below. Furthermore, Moore's performance of his duties is not an element of his retaliation claim discussed below. See Abrego v. Wilkie, 907 F.3d 1004, 1014 (7th Cir. 2018).

224 (7th Cir. 2017); Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016).

Moore has not presented evidence on each element of the direct method. Specifically, he has not presented evidence of a racial discriminatory motive by anyone. See Young, 135 S.Ct. at 1345 (The direct method requires evidence that an employment action "relies expressly on a protected characteristic."). As noted above, Moore did not convey to anyone at State Farm the "mistreatment" he experienced at State Farm was due to his race prior to filing his December 2013 Charge. Moore speculates that race must have been the motive, but speculation is not competent evidence. See Abrego, 907 F.3d at 1014 (A plaintiff's personal beliefs are insufficient to create an issue of fact to overcome summary judgment). He cannot overcome State Farm's motion for summary judgment for any of his discrimination claims based on the direct method.

Moore also has not presented evidence on each element of the indirect burden-shifting method. Moore first alleges race discrimination because he was denied promotion from Support Systems Specialist to a Service Level Liaison on the Server Hardware team. Moore has failed to show that he was denied a promotion at all:

> To demonstrate a *prima facie* case for failure to promote, a plaintiff must produce evidence showing that: (1) [he or] she

was a member of a protected class; (2) [he or] she was
qualified for the position sought; (3) [he or] she was rejected for
the position; and (4) the employer promoted someone outside
of the protected class who was not better qualified for the
position. <u>Jaburek v. Foxx</u>, 813 F.3d 626, 631 (7th Cir. 2016)
(citation omitted). Summary judgment for the employer is
appropriate if the employee fails to establish any of
the elements of a *prima facie* case
for failure to promote. <u>See</u> <u>Atanus v. Perry</u>, 520 F.3d 662, 673
(7th Cir. 2008) (citation omitted).

<u>Riley v. Elkhart Community School</u>, 829 F.3d 886, 892 (7th Cir. 2016).

Moore fails to present evidence that he was denied the Service Level

Liaison position because no such position existed in the Server Hardware

unit.  Furthermore, Moore fails to present evidence that a person outside

the protected class received the promotion, because no one was promoted.

Danner transferred the work to Probst because he was already an Analyst-

level employee.  Danner did not promote him.  Danner did not promote

anyone.  Danner did not create a new Analyst-level position.  Moore,

therefore, fails to present evidence of any discrimination in relation to a

failure to promote.

Moore argues that he proved that the Service Level Liaison position

was open and available because there was a gap in the Server Hardware

team that required a Service Level Liaison and he performed those duties.

Therefore, the position existed.  The Court disagrees.  Moore may have

shown that Danner was penny-wise and pound-foolish because he did not

want to spend the money to create another Analyst-level position, but that only proves he was a bad manager.[9]  The evidence does not prove the position existed.  The Court does not evaluate the wisdom of business decisions.  See e.g., Argyropoulos v. City of Alton, 539 F.3d 724, 736 (7th Cir. 2008) (Court does "not sit as a 'super personnel review board' that second-guesses an employer's facial legitimate business decisions." (quoting Culver v. Gorman & Co., 416 F.3d 540, 547 (7th Cir. 2005)). Moore fails to show a failure to promote because no Service Level Liaison position was open and available to him.  He cannot make out his discrimination claim on his alleged failure to promote.

Moore also alleges race discrimination because he was told to monitor or mentor Probst.  Moore presents some evidence that  he suffered an adverse employment action in April 2013.  Young, 135 S.Ct. at 1345. For purpose of employment discrimination, an adverse employment action is a quantitative or qualitative change in the terms and conditions of employment that is more than a mere subjective preference, including termination, less distinguished title, material loss of benefits, or significantly diminished material responsibilities.  See Johnson v. Cambridge Industries,

_____

[9] Moore stated that Hillesheim and Spurgin were ignorant of the fact that the Server Hardware unit needed a Service Level Liaison.  Moore Deposition, vol. 1, at 133-34.  This testimony again supports the proposition that they, like Danner, were bad managers, but does not show that a Service Level Liaison position was open in the Server Hardware unit.

Inc., 325 F.3d 892, 901-02 (7th Cir. 2003).  When read favorably to Moore,

Moore suffered a significant reduction in his responsibilities at work.  He

was performing Service Level Liaison duties.  Those duties were taken

away from him and he was ordered to train and mentor his replacement.  A

fact finder could conclude that this change in duties was an adverse

employment action.

Moore, however, does not present evidence of a similarly situated

non-black employee who was treated better than he.  Probst was not

similarly situated to Moore because Probst was not a System Support

Specialist.  Probst was already an Analyst when Danner authorized the

transfer of duties, and Probst was not ordered to monitor or mentor anyone.

Moore identifies no one who was in Moore's position and was not

instructed to mentor his or her successor in the job.  He does not present

evidence of race discrimination under the indirect burden-shifting method.

Moore alleges he was discriminated against when he was fired

because of his race.  Termination is clearly an adverse employment action.

Moore again, however, does not present evidence of a similarly situated

non-black who had a comparable employment history who Peters and

Hillesheim did not fire.  Moore Deposition, at 131-32.  He does not present

evidence of race discrimination under the burden-shifting method.  State

Farm is entitled to summary judgment on Moore's race discrimination claims.

Harassment

Moore alleges illegal harassment because Hillesheim and Spurgin directed him to monitor or mentor Probst. Moore fails to present evidence that these events constituted racial harassment. Harassment under Title VII means an individual is subjected to a racially hostile work environment that is so severe and pervasive that the terms and conditions of employment are altered. See Vance v. Ball State University, 570 U.S. 421, 427 (2013); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993). The work environment must be both objectively and subjectively racially hostile. See Harris, 510 U.S. at 21; Yancick v. Hanna Steel Corp., 653 F.3d 532, 545 (7th Cir. 2011). Moore presents no evidence of either an objectively or subjectively racially hostile environment. Moore presents no evidence that Danner, Hillesheim, or Spurgin acted out of racial animus or engaged in any racially hostile acts. Moore again speculates that race was the ultimate cause for the direction to mentor Probst, but speculation is not evidence.[10] See Abrego, 907 F.3d at 1014 (A plaintiff's personal beliefs are insufficient

---

[10] Moore bitterly complained about bullying, but Moore never asserted in any of his complaints that the alleged bullying was racially motivated.

to create an issue of fact to overcome summary judgment).  Moore cannot

prove a Title VII harassment claim.  State Farm is entitled to summary

judgment on Moore's racial harassment claim.

Retaliation

    To overcome summary judgment on a retaliation claim, Moore must

present evidence that: (1) he engaged in protected activity, such as

complaining about racial discrimination; (2) he suffered an adverse

employment action; and (3) a causal connection between the protected

activity and the adverse employment action.  See Luckie v. Ameritech

Corp., 389 F.3d 708, 714 (7th Cir. 2004).[11]  Protected activity means

opposing a practice made unlawful by Title VII.  See 42 U.S.C. § 2000e-

3(a).

    Moore did not engage in protected activity until he filed his first

charge of discrimination dated December 24, 2013.  That was the first time

he claimed that he was subjected to racial discrimination.  Moore had

previously complained about his treatment at work, but he never claimed

that the mistreatment was racial discrimination.  The "formal complaint of

civil rights violation" referred to in his December charge of discrimination

---

[11] Moore could also pursue a burden-shifting method to overcome summary judgment.  See Nichols v. Southern Illinois University-Edwardsville, 510 F.3d 772, 784-85 (7th Cir. 2007).  As with his discrimination claims, however, Moore has not presented any evidence of any similarly situated person outside of his protected group that was treated better than he.

contains no allegation of racial discrimination. His prior complaints were not protected activity. Tomanovich v. City of Indianapolis, 457 F.3d 656, 663-64 (7th Cir. 2006) and cases cited therein. Moore, therefore, cannot present evidence of retaliation for any events that occurred prior to that date. This includes the failure to promote in April 2013 and the instruction to mentor Probst.

Moore states that he engaged in protected activity at the March 21, 2014 meeting. He told Hillesheim and West that he planned to file more charges of discrimination. Filing charges of discrimination with the IDHR or EEOC is protected activity. See Tomanovich, 457 F.3d at 663. Moore then was placed on paid administrative leave and, later, discharged from his employment on April 7, 2014. Being placed on paid administrative leave is not an adverse employment action for purposes of Title VII retaliation claims. Nichols v. Southern Illinois University-Edwardsville, 501 F.3d 772, 786-87 (7th Cir. 2007). Moore has no claim for retaliation based on his placement on paid leave.

Moore also claims that he was discharged because of his protected activity at the March 21, 2014 meeting. The only evidence Moore presents is the sequence of events. On March 21, 2014, Moore engaged in protective activity by stating that he would file more charges, and 15 days

later, on April 4, 2014, Moore was notified that he was terminated. This timing evidence is not sufficient. "'[T]emporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter.'" Abrego, 907 F.3d at 1015 (quoting O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir 2011)). Moore must present "other evidence that supports the inference of a causal link" in addition to the timing of events. Abrego, 907 F.3d at 1015.

Moore presents no other evidence to support a causal link. In fact, the evidence indicates that Hillesheim contemplated terminating Moore before the March 21 Meeting. Hillesheim specifically stated that Moore was facing possible termination in the March 10, 2014 Memorandum. Moore has no claim for retaliation based on his discharge. State Farm is entitled to summary judgment on all of Moore's remaining claims.

Moore's Jury Request (d/e 105) and
State Farm's Motion to Strike Reply (d/e 128)

Because State Farm is entitled to summary judgment on all of Moore's remaining claims, Moore's Jury Request (d/e 105) and State Farm's Motion to Strike Moore's Reply (d/e 128) are denied as moot.

THEREFORE, IT IS ORDERED that Plaintiff Keirand R. Moore's Motion for Summary Judgment (d/e 94) is DENIED; Plaintiff's Jury Request (d/e 105) is DENIED at moot; Defendant State Farm Mutual Automobile

Insurance Company's Cross-Motion for Summary Judgment on Events Leading up to and Culminating with Moore's 2012 Demotion and Corresponding Salary Reduction (d/e 110) is ALLOWED; Defendant's Cross-Motion for Summary Judgment on all Remaining Claims (d/e 114) is ALLOWED; and Defendant's Motion to Strike Reply (d/e 128) is DENIED as moot. The Court enters summary judgment in favor of Defendant State Farm Mutual Automobile Insurance Company and against Plaintiff Keirand Moore on all remaining claims. THIS CASE IS CLOSED.

ENTER: January 28, 2019

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE

# GLOSSARY OF STATE FARM ACRONYMS

BA        Business Analyst

BLS      (unknown meaning)

BASE    (unknown meaning)

CCDS    Customer Connection/Department Services

CLS      Customized Learning Schedule

COC     State Farm Code of Conduct

CPT      Client Production Team

EOD     End of the day

EPR      Employee Performance Results Tool

ESR     Enterprise Server Release

HR        Human Resources

ISC       Insurance Support Center *or* Insurance Service Center. (The Court found both names associated with this acronym.).

ITIL      International Library for Information Technology *or* Information Technology Infrastructure Library.  (The Court found both names associated with this acronym.).

JOP     Job Opportunity Program

ODP     Open Door Policy

OLA     Operational Level Agreement

| OSS | Organizational Support Specialist |
|-----|-----------------------------------|
| PM  | Project Manager |
| PSL | Paid Sick Leave |
| SF  | State Farm |
| SH  | Windows Server Hardware Team |
| SLL | Service Level Liaison |
| SLM | Service Level Manager |
| SM  | Service Management |
| SSS | Systems Support Specialist |
| TAB | Test Analyst – Business |
| TP  | Talent Profile |